**Appeal No. 15-7061**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

THE AMERICAN LEGION, AMVETS, MILITARY ORDER OF THE PURPLE HEART, VIETNAM VETERANS OF AMERICA, AND NATIONAL VETERANS LEGAL SERVICES PROGRAM,

Petitioners,

v.

ROBERT A. MCDONALD, IN HIS OFFICIAL CAPACITY AS SECRETARY OF VETERANS AFFAIRS,

Respondent.

---

**BRIEF OF *AMICUS CURIAE* MAZON: A JEWISH RESPONSE TO HUNGER IN SUPPORT OF PETITIONERS**

---

Brian Berliner
bberliner@omm.com
Catalina Vergara
cvergara@omm.com
Dimitri D. Portnoi
dportnoi@omm.com
Jason A. Orr
jorr@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000

*Attorneys for* Amicus Curiae *MAZON: A Jewish Response to Hunger*

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**
**THE AMERICAN LEGION ET AL. V. MCDONALD**
**No. 15-7061**

## CERTIFICATE OF INTEREST

Counsel for *amicus curiae* MAZON: A Jewish Response to Hunger certifies the following:

**1. The name of every party or amicus represented by me is:**

MAZON: A Jewish Response to Hunger.

**2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

Not Applicable

**3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:**

None.

**4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:**

O'Melveny & Myers LLP: Catalina Vergara, Nicholas Whilt, Dimitri Portnoi, and Jason Orr.

Dated: June 2, 2015

O'MELVENY & MYERS LLP

By: */s/ Brian Berliner*
Brian Berliner
bberliner@omm.com

Attorney for *Amicus Curiae*

# TABLE OF CONTENTS


**Page**

INTRODUCTION .......................................................................................1

INTEREST OF *AMICUS CURIAE*...........................................................2

THE FINAL RULE.......................................................................................2

ARGUMENT ..............................................................................................4

I. THE VA DID NOT ADEQUATELY CONSIDER IMPACT ON FOOD-INSECURE VETERANS...............................................4

A. Food security is uniquely important. .............................................5

B. Veterans suffer disproportionately from food insecurity. ..................6

C. VA disability adjudications are critical to the food security of many veterans. .................................................................8

D. Veterans already face a cumbersome process for obtaining their earned benefits, and the Final Rule will only worsen their access to those benefits. ..................................................10

E. The VA ignored the Final Rule's impact on food security. ...............12

II. THE VA DID NOT ADEQUATELY CONSIDER VETERANS' DIFFICULTY IN ACCESSING BENEFITS............................................14

A. Large portions of the veteran population will have difficulty obtaining benefits under the Final Rule. ............................................15

B. Congress has recognized the need to affirmatively assist veterans in obtaining benefits. ...........................................................17

C. The VA has historically recognized that veterans need assistance in filing claims for benefits. ............................................19

D. The Final Rule makes it more difficult for veterans to obtain benefits. ..........................................................................20

CONCLUSION..........................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Comer v. Peake*,
552 F.3d 1362 (Fed. Cir. 2009) ....................10, 14

*Harris v. Shinseki*,
704 F.3d 946 (Fed. Cir. 2013) ....................19

*Roberson v. Principi*,
251 F.3d 1378 (Fed. Cir. 2001) ....................17

*Shinseki v. Sanders*,
556 U.S. 396 (2009)....................17

*Veterans for Common Sense v. Shinseki*,
644 F.3d 845 (9th Cir. 2011), *reh'g granted*, 663 F.3d 1033 (9th Cir. 2011) ....................11

*Walters v. Nat'l Ass'n of Radiation Survivors*,
473 U.S. 305 (1985)....................19

## STATUTES

7 U.S.C. § 2012(j) ....................9

7 U.S.C. § 2012(j)(4)–(6)....................9

7 U.S.C. § 2014....................9

7 U.S.C. § 2014(e) ....................9

38 U.S.C. § 5102....................18

38 U.S.C. § 5102(a) ....................10

38 U.S.C. § 5103....................18

38 U.S.C. § 5103A....................18

38 U.S.C. § 5106....................18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**REGULATIONS**

7 C.F.R. § 271.2 .......... 9, 10

38 C.F.R. § 3.155(a) (2014) .......... 19

**FEDERAL REGISTER**

79 Fed. Reg. 57,660 (Sept. 25, 2014) .......... *passim*

**RULES**

Fed. R. App. P. 29(c)(5) .......... 2

**OTHER AUTHORITIES**

Alisha Coleman-Jensen & Mark Nord, USDA, *Food Insecurity Among Households with Working-Age Adults with Disabilities* 3 (Jan. 2013), *available at* http://www.ers.usda.gov/media/980690/err_144.pdf .......... 7

Benjamin Pomerance, *Fighting on Too Many Fronts: Concerns Facing Elderly Veterans in Navigating the United States Department of Veterans Affairs Benefits System*, 37 Hamline L. Rev. 19 (2013/2014) .......... 11

Brynne Keith-Jennings, Ctr. for Budget & Pol'y Priorities, *SNAP Helps Roughly 1.7 Million Struggling Veterans, Including Thousands in Every State* (Nov. 11, 2014) .......... 8

*Definitions of Food Security*, USDA, http://www.ers.usda.gov/topics/food-nutrition-assistance/food-security-in-the-us/definitions-of-food-security.aspx .......... 6

Feeding America, *Child Development*, http://www.feedingamerica.org/hunger-in-america/impact-of-hunger/child-hunger/child-development.html .......... 5

*Food Security in the U.S.*, USDA, http://www.ers.usda.gov/topics/food-nutrition-assistance/food-security-in-the-us.aspx .......... 6

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

H.R. Rep. No. 100-963 (1988), reprinted in 1988 U.S.C.C.A.N. 5782....................17

H.R. Rep. No. 106-781 (2000), reprinted in 2000 U.S.C.C.A.N.. 2006..................18

Hilary K. Seligman et al., *Food Insecurity is Associated with Chronic Disease Among Low-Income NHANES Participants*, 140(2) J. Nutrition 304 (2010) .....................................................................................6

*How Common is PTSD?*, U.S. Dep't of Veterans Affairs, http://www.ptsd.va.gov/public/PTSD-overview/basics/how-common-is-ptsd.asp ...........................................................................16

Key Statistics & Graphics, USDA, http://www.ers.usda.gov/topics/food-nutrition-assistance/food-security-in-the-us/key-statistics-graphics.aspx ....................................................7

*Polytrauma/TBI System of Care*, U.S. Dep't of Veterans Affairs, http://www.polytrauma.va.gov/understanding-tbi/............................................16

R.S. Allen et al., *Internet Connectivity Among Rural Alabama Veterans: Baseline Findings from the Alabama Veterans Rural Health Initiative Project*, 13 Rural & Remote Health 2138 (2013) ...................16

Rachel Widome et al., *Food Insecurity Among Veterans of the U.S. Wars in Iraq and Afghanistan*, 18 Pub. Health Nutrition 844 (2015) ..................5

Susan Seliger, *The 'Long and Unacceptable' Wait for a Veterans' Benefit*, N.Y. Times (May 15, 2013), http://newoldage.blogs.nytimes.com/2013/05/15/the-long-and-unacceptable-wait-for-a-veterans-benefit..........................................................11

Terrence T. Griffin & Thomas D. Jones, *The Veteran Claims Assistance Act of 2000: Ten Years Later*, 3 Veterans L. Rev. 284 (2011)...........................................................................................................18

U.S. Dep't of Housing & Urban Dev., 2014 Annual Homeless Assessment Report (AHAR) to Congress (2014), *available at* https://www.hudexchange.info/resources/documents/2014-AHAR-Part1.pdf.............................................................................................7, 8

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

U.S. Dep't of Veterans Affairs, *Profile of Sheltered Homeless Veterans for Fiscal Years 2009 and 2010* (2012)....................13

U.S. Dep't of Veterans Affairs, *Unique Veteran Users Report FY 2012* (2014)....................13

U.S. Dep't of Veterans Affairs, *Veterans Employment 2000 to 2013* (2014)....................13

Westat, *National Survey of Veterans, Active Duty Service Members, Demobilized National Guard and Reserve Members, Family Members, and Surviving Spouses* (2010), *available at* http://www.va.gov/SURVIVORS/docs/NVSSurveyFinalWeightedReport.pdf ....................15, 16

# INTRODUCTION

For all their sacrifices, many veterans are left unable to keep themselves and their families fed. Hundreds of thousands of veterans suffer from food insecurity, meaning they are not able to get enough food to lead a healthy life. Food insecurity is a symptom of the chronic homelessness and poverty that exist in the veteran population, which are often exacerbated by both mental and physical injuries sustained during military service. These vulnerable men and women depend for their survival on disability benefits from the Department of Veterans Affairs ("VA"), as well as the Supplemental Nutrition Assistance Program ("SNAP"), which uses disability adjudications by the VA to determine eligibility.

The Final Rule challenged by Petitioners will make it more difficult for these vulnerable veterans to get the nutrition assistance they need. In promulgating the Final Rule, the VA cited efficiency—surely an admirable goal, at a time when a tremendous backlog of claims is causing unprecedented delays in processing, but not one that should come at the expense of homeless, hungry, and poor veterans. The VA did not consider the importance of disability compensation for veterans struggling at the edge, and it did not consider the interplay between disability adjudications and other government assistance programs like SNAP. As a result, the Final Rule acts to reduce the amount of disability compensation and SNAP benefits that some food-insecure veterans will receive. It also departs from a

congressionally mandated policy of assisting veterans with their claims, and it arbitrarily deprives veterans without Internet access of their earned benefits. For these reasons, this Court should declare the Final Rule unlawful.

## INTEREST OF *AMICUS CURIAE*[1]

MAZON: A Jewish Response to Hunger is a national nonprofit organization working to end hunger among people of all faiths and backgrounds in the United States and Israel. Founded in 1985, MAZON partners with food banks and pantries that provide for people who are hungry while at the same time advocating for other ways to end hunger and its causes. Through its "Help Our Heroes" initiative, MAZON works with legislators and activists to identify and eliminate the barriers that prevent veterans and military families from accessing vital safety net programs. MAZON has a strong interest in the development of sensible and compassionate rules for veterans' access to vital government benefits.

## THE FINAL RULE

On September 25, 2014, the VA published a final rule entitled Standard Claims and Appeals Forms ("Final Rule") in an attempt to "improve the quality

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), MAZON states that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and that no person other than MAZON, MAZON's members, or MAZON's counsel contributed money that was intended to fund preparing or submitting this brief. Petitioners and Respondent, through their respective counsel, consented to the filing of this brief.

and timeliness of the processing of veterans' claims." 79 Fed. Reg. 57,660, 57,660 (Sept. 25, 2014) (to be codified in scattered sections of 38 C.F.R.). This Final Rule made two important and detrimental changes to how claims for veterans benefits are filed and processed—changes that will impede veterans' ability to receive their earned benefits and will concentrate the negative impacts on the most vulnerable parts of the veteran community.

First, the Final Rule narrowed the scope of the disability conditions that the VA will adjudicate to those specifically identified by the claimant, as well as related complications. 79 Fed. Reg. at 57,673; *see also* Pet'rs' Br. at 51. Whereas the VA has historically adjudicated every potential claim supported by the evidence before the agency, under the Final Rule it will consider only identified conditions and will disregard all others. A veteran would have to start a separate claim process before the VA would adjudicate those other disabilities.

Second, under the Final Rule the VA will only acknowledge claims that are made on official forms. 79 Fed. Reg. 57,694–696; *see also* Pet'rs' Br. at 13–15. The Final Rule requires that claimants initiate their claims either with the VA's newly developed online portal or with a specific form that provides "notice" of their "intent" to initiate a claim. 79 Fed. Reg. at 57,695–96. If they do not use one of these approved methods for contacting the VA with a claim—if, for instance, they send a handwritten letter to the VA—the VA will not backdate that veteran's

benefits to her date of contacting the VA. *See id.* Instead, the VA will only backdate the benefits to the date on which the VA receives a fully completed form from the veteran. *Id.*; *see also* Pet'rs Br. at 14–15. In their applications, veterans must specify the benefit to which they are entitled and the specific condition that entitles them to those benefits.

## ARGUMENT

### I. THE VA DID NOT ADEQUATELY CONSIDER IMPACT ON FOOD-INSECURE VETERANS

Ensuring that veterans have access to food is critical, and providing such access to severely or totally disabled veterans is the least this nation owes to its returning and injured soldiers. Unfortunately, despite good intentions and best efforts, this is a promise that is not always kept, with painful and even fatal consequences. A disturbing proportion of veterans do not know where their next meal will come from. The Final Rule ignores impacts on food security—which, unlike impacts on other benefits, are doubly felt. A veteran's food security is impacted when she is denied monetary disability benefits, because she must make do with less or no income, making difficult choices between shelter, food, medicine, utilities, and other vital needs. But a veteran feels this impact a second time because a veteran-disability determination can be critical to obtaining additional benefits through the food-stamp program, an essential component of services to veterans that helps ensure a veteran has access to nutritious meals.

Veterans already face challenges in making claims through the VA's daunting claims administration process, where interminable delays and multiple appeals are commonplace. The Final Rule serves only to further perplex veterans as they navigate the VA bureaucracy because it scales down its support to veterans in developing their claims on the evidence before the agency. As a result, veterans might not receive important benefits for which they are eligible, including nutrition assistance through SNAP.

### A. Food security is uniquely important.

Food and nutrition are the most basic of human needs. Being hungry can be all-consuming and distracting, hindering a person's ability to be productive in work or school, to get and hold a job, or to participate in her community and engage with her family. Hunger leads to behavioral and social issues that can, in turn, result in disengagement from activities and heightened levels of anxiety and aggression. *See* Feeding America, *Child Development*, http://www.feedingamerica.org/hunger-in-america/impact-of-hunger/child-hunger/child-development.html (listing studies on children linking hunger to increased fighting, hyperactivity, anxiety, mood swings, and bullying). People who cannot reliably get the food that they need also often suffer from poor health and chronic disease. Rachel Widome et al., *Food Insecurity Among Veterans of the U.S. Wars in Iraq and Afghanistan*, 18 Pub. Health Nutrition 844 (2015);

Hilary K. Seligman et al., *Food Insecurity is Associated with Chronic Disease Among Low-Income NHANES Participants*, 140(2) J. Nutrition 304 (2010) (linking food insecurity with hypertension, hyperlipidemia, and diabetes), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2806885.

Millions of Americans are affected by food insecurity, meaning they are unable to consistently put sufficient food on the table. *Food Security in the U.S.*, USDA, http://www.ers.usda.gov/topics/food-nutrition-assistance/food-security-in-the-us.aspx. Food insecurity disrupts a household's normal eating patterns and creates anxiety over food running out. *Definitions of Food Security*, USDA, http://www.ers.usda.gov/topics/food-nutrition-assistance/food-security-in-the-us/definitions-of-food-security.aspx. Individuals who cannot reliably access quality foods are often forced to eat small or inadequate meals, or skip meals altogether and experience the discomfort, pain, and weakness of hunger. *See id.*

### B. <u>Veterans suffer disproportionately from food insecurity.</u>

Large portions of the veteran community do not know where their next meal will come from. Over one in four veterans from the most recent wars in Iraq and Afghanistan have low or very low food security, compared with one in seven people in the general U.S. population. Widome et al., *supra* (finding that 15% report "low" food security, defined as decreased quality but not intake of food, and 12% report "very low" food security, defined as decreased food intake as a result

of poor access); Key Statistics & Graphics, USDA, http://www.ers.usda.gov/topics/food-nutrition-assistance/food-security-in-the-us/key-statistics-graphics.aspx (reporting food insecurity in 14.3% of U.S. households). Many veterans return from combat with disabilities that make it more difficult to maintain gainful employment and provide food for themselves and their families. Households with a disabled veteran are nearly twice as likely to be food insecure as households that do not have someone with a disability. Alisha Coleman-Jensen & Mark Nord, USDA, *Food Insecurity Among Households with Working-Age Adults with Disabilities* 3 (Jan. 2013), *available at* http://www.ers.usda.gov/media/980690/err_144.pdf.

Of course, hunger is not the only problem disproportionately impacting veterans, though conditions such as homelessness and unemployment are linked to hunger as well. Many veterans suffer from chronic homelessness and persistent poverty. In fact, as of January 2014, almost 50,000 veterans were homeless on any given night. U.S. Dep't of Housing & Urban Dev., 2014 Annual Homeless Assessment Report (AHAR) to Congress 40 (2014), *available at* https://www.hudexchange.info/resources/documents/2014-AHAR-Part1.pdf. In the United States, more than one in ten homeless adults is a veteran. *Id.* And more than 1.4 million veterans live in poverty. Nat'l Coal. for Homeless Veterans, Half in Ten Report — Poverty and Opportunity Profile: Veterans (2014). In 2013, more

than twenty percent of young veterans were unemployed, and of those who worked, many had low-wage jobs. *Id.* Approximately 1.7 million veterans (not including the homeless) rely on government assistance to provide food for their families. Brynne Keith-Jennings, Ctr. for Budget & Pol'y Priorities, *SNAP Helps Roughly 1.7 Million Struggling Veterans, Including Thousands in Every State* (Nov. 11, 2014) (noting that 1.7 million figure likely undercounted the number of homeless veterans), *available at* http://www.cbpp.org/research/snap-helps-roughly-17-million-struggling-veterans-including-thousands-in-every-state. A veteran without a job or a home, or struggling to maintain a home or under-employed, is more likely to also suffer from food insecurity.

### C. VA disability adjudications are critical to the food security of many veterans.

An adjudication that a veteran is partially or totally disabled results in a monthly disability payment from the VA. That payment is critical to survival: to maintaining shelter, to putting food on the table for the veteran and her family, to keeping the lights on, and to getting transportation for medical care. An adjudication that a veteran is totally disabled or home-bound is also critical because it is the predicate for eligibility for food stamps for hundreds of thousands of veterans. Decisions by the VA in the Final Rule will ineluctably lead to fewer veterans having expeditious access to both of these benefits, and will thus lead to a dangerous increase in hunger and food insecurity among many veterans.

Veterans who are adjudicated by the VA to have certain disabilities are also eligible for benefits under SNAP, formerly known as food stamps. *See* 7 U.S.C. §§ 2014 (households with disabled members are eligible for SNAP), 2012(j)(4)–(6) (defining "disabled member" to include certain veterans with disabilities or a veteran's surviving spouse or child); *see also* 7 C.F.R. § 271.2 (SNAP regulations defining disability ratings by VA).[2] SNAP is a federal program that is administered by states. Eligibility for the program is based on household income, but households with members who have qualifying disabilities are able to deduct some expenses (for example, medical expenses) from their income to establish their eligibility and determine benefit amounts. *See* 7 U.S.C. § 2014(e). In determining that a household has a qualifying disabled member, state social services administrators rely on disability determinations from other government agencies, including the VA. *See* 7 U.S.C. § 2012(j). Specifically, veterans are "disabled" for SNAP purposes if they (1) have a total disability rating from the VA or (2) are otherwise considered by the VA to be permanently homebound or in need of regular aid and assistance. 7 C.F.R. § 271.2. For families whose income

[2] Section 271.2 includes eleven definitions of an "[e]lderly or disabled member of a household." Definition (6) is "veteran with a service-connected or non-service-connected disability rated by the [VA]"; definition (7) is "a veteran considered by the VA to be in need of regular aid and attendance or permanently housebound"; and definition (8) is "a surviving spouse of a veteran and considered by the VA to be in need of regular aid and attendance or permanently housebound or a surviving child of a veteran and considered by the VA to be permanently incapable of self-support."

would otherwise disqualify them for SNAP benefits, they must obtain a qualifying disability adjudication from the VA before receiving SNAP benefits.

### D. Veterans already face a cumbersome process for obtaining their earned benefits, and the Final Rule will only worsen their access to those benefits.

As this Court has acknowledged, veterans face a "seemingly interminable struggle to obtain disability benefits" as they find their way through the "labyrinthine corridors of the veterans' adjudicatory system." *Comer v. Peake*, 552 F.3d 1362, 1369 (Fed. Cir. 2009). To be adjudicated as disabled by the VA, a veteran must file an application with the VA that provides biographical information and documentation of her disability and its connection to her military service. Often, a veteran's first submission to the VA will not be sufficient to complete her application because the veteran was not aware of the information needed to complete the claim. A veteran will often begin a claim with a letter or a phone call. *See* 79 Fed. Reg. at 57,661 (noting that "approximately half" of claimants make such "non-standard submissions"). In these cases, the VA responds to the veteran with a long and complicated application form, along with convoluted instructions on how to complete that form and on what evidence the veteran needs to substantiate his claim. 38 U.S.C. § 5102(a); Joint App'x JA298–JA313. All told, it can take months for a veteran to give the VA everything it needs to process the application. *See* Susan Seliger, *The 'Long and Unacceptable'*

*Wait for a Veterans' Benefit*, N.Y. Times (May 15, 2013), http://newoldage.blogs.nytimes.com/2013/05/15/the-long-and-unacceptable-wait-for-a-veterans-benefit (describing average application processing time of between 8 and 18 months). If the claim is denied, appeals could take years even when the veteran has a legitimate claim to benefits. *Veterans for Common Sense v. Shinseki*, 644 F.3d 845, 859 (9th Cir. 2011) (noting that it takes, on average, nearly four years from the date of the appeal for the Board of Veterans' Appeals to issue a decision), *reh'g granted*, 663 F.3d 1033 (9th Cir. 2011). Approximately 3,000 veterans die each year waiting for their disability claims to be processed. Benjamin Pomerance, *Fighting on Too Many Fronts: Concerns Facing Elderly Veterans in Navigating the United States Department of Veterans Affairs Benefits System*, 37 Hamline L. Rev. 19, 23 (2013/2014).

This process stands between many veterans and the assistance and food they need to survive. They depend on the VA's determination of disability not only for the compensation benefits they receive from the VA, but also to qualify for the SNAP benefits they need to put food on their family's table. The delay and denial of monetary VA disability benefits, as well as the delay in receiving SNAP food stamp benefits, force veterans into difficult decisions about providing for their nutritional and other essential needs. A disabled veteran with neither VA nor SNAP benefits must make do with what meager resources may be available to her,

which leaves her well-being and survival threatened across the board with respect to shelter, medical care, and hunger. Receipt of VA disability benefits will aid the veteran by providing her the option of using the monetary payment for various purposes: to maintain shelter, utilities, food, and other vital needs. When a disabled veteran receives SNAP, she will have an income source dedicated solely to food and can achieve a vital extra measure of food security.

But under the Final Rule, the VA has abdicated its responsibility to consider all available evidence in determining whether the claimant has the sort of disability that would make him eligible for SNAP. Under the Final Rule, the VA will not look past the disability specifically identified in the claimant's application. *See* 79 Fed. Reg. at 57, 673; Pet'rs' Br. at 51–52. Even if the evidence unambiguously shows that the claimant has other disabilities, perhaps even more severe disabilities that would make the veteran qualified for SNAP, the VA will no longer adjudicate those other disabilities—some of which would have enabled the veteran to qualify for SNAP benefits. *See* Pet'rs' Br. at 52 (describing scenario in which veteran files claim for PTSD but evidence shows he is a double amputee). The veteran would have to file a separate application and wait even longer.

### E. <u>The VA ignored the Final Rule's impact on food security.</u>

The VA's explanation for its Final Rule does not address the well-known fact of food insecurity among veterans. *See id.*; 2014 AHAR to Congress. The

Final Rule does not acknowledge any of the VA's own data on veteran poverty, and it does not recognize that many veterans rely on their disability status as determined by the VA in order to qualify for critical social services like SNAP. *See* U.S. Dep't of Veterans Affairs, Veteran's Supplemental Nutritional Assistance Program (SNAP) Participants: 2012 American Community Survey (2014) (noting the numbers of veterans who rely on SNAP), *available at* http://www.va.gov/vetdata/docs/SpecialReports/SNAPVeterans2012.pdf; U.S. Dep't of Veterans Affairs, *Veterans Employment 2000 to 2013* (2014) (noting high unemployment in veteran population), *available at* http://www.va.gov/vetdata/docs/SpecialReports/Employment_Rates_FINAL.pdf; U.S. Dep't of Veterans Affairs, *Unique Veteran Users Report FY 2012* 13 (2014) (noting lower income in households that use VA benefits), *available at* http://www.va.gov/vetdata/docs/SpecialReports/Profile_of_Unique_Veteran_Users.pdf; U.S. Dep't of Veterans Affairs, *Profile of Sheltered Homeless Veterans for Fiscal Years 2009 and 2010* 3 (2012) (noting that veterans are overrepresented among homeless population), *available at* http://www.va.gov/vetdata/docs/SpecialReports/Homeless_Veterans_2009-2010.pdf. These ancillary benefits are the only way for some veterans to feed themselves and their families. In the absence of SNAP benefits, moreover, VA disability benefits also can help prevent hunger, at least offering veterans a choice

between food and other core survival needs such as shelter and utilities. The VA did not consider the connection between various disability determinations and these separate benefits that provide relief for people's immediate, critical needs.

## II. THE VA DID NOT ADEQUATELY CONSIDER VETERANS' DIFFICULTY IN ACCESSING BENEFITS

The struggle veterans must endure to obtain the benefits to which they are entitled is nothing new, and this Court in particular does not need to be reminded of the many hurdles facing a veteran. *See, e.g.*, *Comer v. Peake*, 552 F.3d 1362, 1365–71 (Fed. Cir. 2009) (summarizing the hurdles faced by a mentally disabled veteran in his twenty-year struggle to obtain disability compensation). Congress and the VA have historically recognized this concern by ensuring that an effective date can be locked in on even an informal claim—a critical rule since it ensures that a veteran will not be denied benefits because of initial technical non-compliance—and by ensuring the VA will consider all evidence of disability on the record, even if not directly presented or pointed out by the veteran in her application or letter. The VA has now eliminated both longstanding rules, without any consideration of the impact on such an important issue as veteran hunger. Under the Final Rule, the VA will penalize veterans for not initiating their claim with a particular form, and it will disregard evidence of other disabilities not identified by claimants on their form. These changes—which are contrary to the intent of Congress and are a sharp departure from the VA's historical practices—

increase the likelihood that veterans will unwittingly be deprived of their earned benefits, including SNAP benefits.

### A. <u>Large portions of the veteran population will have difficulty obtaining benefits under the Final Rule.</u>

The Final Rule as amended relies heavily on a veteran's ability to access the Internet in order to, in turn, access benefits. In apparent response to certain comments, the Final Rule was amended to create an "Intent to File a Claim" form that a claimant could use to lock in an early effective date before completing her claim. But this amendment changes little for claimants who initiate their claim with a letter or other informal means. These claimants will lose benefits under the Final Rule, measured by the time between their initial contact with the VA and their submission of a properly completed "Intent to File a Claim" form. In this way, both the original proposed rule and the Final Rule favor an online portal for most disability adjudications.

Large portions of the veteran population lack Internet access, impacting the ability of a veteran to secure an effective date or take advantage of any online portal. In a 2010 survey, about 28% of veterans reported that they did not access the Internet at all. Westat, *National Survey of Veterans, Active Duty Service Members, Demobilized National Guard and Reserve Members, Family Members, and Surviving Spouses* 97 (2010), *available at* http://www.va.gov/SURVIVORS/docs/NVSSurveyFinalWeightedReport.pdf.

Most veterans are more than 55 years old, a group that reports the most difficulty in accessing the Internet. *Id.* at 53. Veterans enrolled in the Veterans Health Administration are twice as likely to live in rural areas, where Internet penetration lags behind urban areas. R.S. Allen et al., *Internet Connectivity Among Rural Alabama Veterans: Baseline Findings from the Alabama Veterans Rural Health Initiative Project*, 13 Rural & Remote Health 2138 (2013). And for obvious reasons, the large number of homeless veterans have difficulty accessing the Internet.

Many veterans suffer from disabilities or behavioral disorders that hinder their ability to comply with the Final Rule's added administrative burdens. Between 10 and 20 percent of veterans are currently diagnosed with Post Traumatic Stress Disorder ("PTSD") in a given year. *How Common is PTSD?*, U.S. Dep't of Veterans Affairs, http://www.ptsd.va.gov/public/PTSD-overview/basics/how-common-is-ptsd.asp. PTSD is associated with increased anxiety, which could make it difficult or impossible for someone to navigate the VA's bureaucracy without help. Similarly, veterans who have experienced traumatic brain injuries may have fatigue and memory problems that would make complying with complex administrative systems overwhelming. *See Polytrauma/TBI System of Care*, U.S. Dep't of Veterans Affairs, http://www.polytrauma.va.gov/understanding-tbi. These veterans are surely less

able to "correctly" fill out a long and complicated form by listing every disability they might have that would make them eligible for benefits. Given that the population most impacted by food insecurity includes those suffering from not only a disability, but total disability, PTSD and traumatic brain injury represent just two examples of conditions that could severely impact a veteran's ability to successfully navigate the maze of forms, online portals, and regulations set up by the VA.

### B. Congress has recognized the need to affirmatively assist veterans in obtaining benefits.

These rule changes take place against a background of congressional preference for helping veterans and not punishing them for technical non-compliance. Congress has repeatedly demonstrated a "special solicitude for the veterans' cause." *Shinseki v. Sanders*, 556 U.S. 396, 412 (2009). "Congress has mandated that the VA is 'to fully and sympathetically develop the veteran's claim to its optimum before deciding it on the merits.'" *Roberson v. Principi*, 251 F.3d 1378, 1384 (Fed. Cir. 2001) (quoting H.R. Rep. No. 100-963, at 13 (1988), reprinted in 1988 U.S.C.C.A.N. 5782, 5795). This duty requires the VA to "determine[] all potential claims raised by the evidence, applying all relevant laws and regulations." *Id.*

Congress reinforced this duty when it passed the Veterans Claims Assistance Act of 2000 ("VCAA") to help link veterans with the benefits they are entitled to.

That law codified the VA's longstanding "policy of aiding all claimants to compile evidence in favor of their respective claims." Terrence T. Griffin & Thomas D. Jones, *The Veteran Claims Assistance Act of 2000: Ten Years Later*, 3 Veterans L. Rev. 284, 286 (2011); *see also id.* at 293 (citing H.R. Rep. No. 106-781, at 7–9 (2000), reprinted in 2000 U.S.C.C.A.N.. 2006, 2009–12) (discussing aims of VCAA). The VCAA requires that the VA provide claimants with all necessary instructions and forms to apply for benefits, and that the VA contact claimants who file incomplete forms and provide them with all information necessary for them to complete the application. 38 U.S.C. §§ 5102, 5103. The VCAA further requires the VA to assist veterans in obtaining all the evidence necessary to substantiate the claimant's claim for benefits, including obtaining relevant records identified by a claimant, and to notify claimants of any documents the VA was unable to collect on its own. 38 U.S.C. § 5103A. All of this assistance is provided to veterans at no cost to them. 38 U.S.C. § 5106.

These statements and acts of Congress reflect a judgment, to which this Court and the VA should defer, that veterans would have difficulty navigating a formal claim process by themselves. Veterans will likely not be aware of all the benefits for which they qualify, and they might be intimidated by the claim submission process. Moreover, veterans are denied the assistance of paid counsel. The Supreme Court upheld the constitutionality of a system denying veterans the

paid assistance of counsel, noting that "concomitant of Congress' desire that a veteran not *need* a representative was that the system should be *as informal and nonadversarial as possible*." *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 323 (1985) (emphasis added). Under the Final Rule, if a veteran fails to identify a disability on the form application, the VA will not adjudicate that disability even if there is sufficient evidence in the record. And a veteran who files an informal letter will not lock in an effective date and lose substantial benefits. This does not give meaning to Congress's mandate that the system be as informal as possible. The Final Rule is contrary to Congress's intent that the VA "generously construe a pro se veteran's filing to discern all possible claims raised by the evidence." *Harris v. Shinseki*, 704 F.3d 946, 948 (Fed. Cir. 2013).

### C. <u>The VA has historically recognized that veterans need assistance in filing claims for benefits.</u>

This policy of assisting veterans to develop the facts of their case originated in the VA, Griffin & Jones, *supra*, at 285, as did the decades-long policy of accepting informal claims in the form of any "communication or action[] indicating an intent to apply for one or more benefits." 38 C.F.R. 3.155(a) (2014); *see also* 79 Fed. Reg. at 57,665 (describing previous definition of claim). The VCAA and other statutes governing veterans' benefits claims were intended to codify and be compatible with the VA's historical practices in assisting veterans by fully and sympathetically developing their claims with whatever evidence is

available to the VA. *See* Pet'rs' Br. at 22–34.

With the Final Rule, the VA departs from this claimant-friendly approach to benefits claims adjudication in order to be more efficient. Part of this efficiency will come in the form of claims that are never made because veterans will not know to make them or because they give up in confusion or frustration. In far too many cases, this will result in more veterans struggling to feed themselves and their families.

**D. <u>The Final Rule makes it more difficult for veterans to obtain benefits.</u>**

The Final Rule only acknowledges a claim if it comes to the VA either through its online portal or through an officially designated form. 79 Fed. Reg. 57,694–96; *see also* Pet'rs' Br. at 13–15. Claimants who reach out to the VA through "informal" means like letters will not have their claims heard until they file the designated paperwork. *Id.* And their eventual disability payments will not be backdated to the date they first contacted the VA but rather the date they filed the correct form. *Id.*

These impacts are focused on those who lack Internet access. Only claimants who use "informal" methods to initiate a claim are penalized under the Final Rule. Claimants who use the VA's online portal, or who know to begin their claim with the official forms, are privileged over claimants who do not. The VA received comments on how the Proposed Rule discriminated against people

without access to the Internet, but its response only reaffirms that discrimination. The Final Rule needlessly denies benefits to veterans who communicate with the VA through informal means, purportedly to provide an incentive to use an online portal that nearly thirty percent of veterans cannot access.

The VA claims this change is necessary to facilitate efficient claims processing, but the VA is still required by statute to provide assistance to veterans in correcting and substantiating their claims. The only difference under the Final Rule is that veterans who do not use the VA's Intent to File a Claim form in their first communication with the VA will be shortchanged benefits for the period between their first contact with the VA and their filing of the Intent form, which the VA must provide to the claimant. Many veterans making an informal communication to initiate the claim process would understandably have little confidence that the VA would provide the required Intent form to them in a timely way, based on the poor track record of VA timely responses in other matters. *See* Seliger, *supra* (recounting anecdotes from veterans who struggled to get in touch with anyone at the VA).

And the unnecessary narrowing of the VA's scope of adjudication, whereby under the Final Rule the VA will adjudicate only the disabilities identified on the claim form, will have its greatest impact on food-insecure veterans. These veterans rely on VA disability adjudications for their eligibility for the SNAP

program and will be hindered in their ability to feed themselves and their families if the VA ignores evidence of another disability that could qualify them for SNAP benefits.

In short, the Final Rule achieves minimal, if any, efficiencies, while depriving the most vulnerable veterans of the benefits they earned through past service by erecting artificial and unnecessary barriers. And despite these increases in formalities, veterans are still unable to enlist the paid assistance of counsel. The Final Rule leaves disabled veterans with higher hurdles between them and their earned benefits, and provides less help in surmounting those hurdles.

## CONCLUSION

For the foregoing reasons, this Court should set aside the Final Rule because it is unlawful and contrary to the VA's role as a sympathetic, claimant-friendly system.

Dated: June 2, 2015

O'MELVENY & MYERS LLP
BRIAN BERLINER
CATALINA VERGARA
DIMITRI D. PORTNOI
JASON A. ORR

By: *_/s/ Brian Berliner_*
Brian Berliner
bberliner@omm.com

400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

Attorneys for *Amicus Curiae* MAZON: A Jewish Response to Hunger

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of June, 2015, I caused a copy of the foregoing BRIEF OF *AMICUS CURIAE* MAZON: A JEWISH RESPONSE TO HUNGER IN SUPPORT OF PETITIONERS to be served by electronic means (by email or CM/ECF).

Dated: June 2, 2015

O'MELVENY & MYERS LLP

By: */s/ Brian Berliner*

Brian Berliner, Bar No. 156732
bberliner@omm.com

400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

Attorney for *Amicus Curiae* MAZON: A Jewish Response to Hunger

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(d) and 32(a)(7)(B). According to the word-processing system used to prepare it, this brief contains 5,139 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

I certify that this brief complies with the line spacing requirements of Fed. R. App. P. 32(a)(4), the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6) by using Microsoft Office Word in Times New Roman 14 point font.

Dated: June 2, 2015

O'MELVENY & MYERS LLP

By: */s/ Brian Berliner*

Brian Berliner, Bar No. 156732
bberliner@omm.com

400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

Attorney for *Amicus Curiae* MAZON: A Jewish Response to Hunger